Filed: 6/14/2019 10:49 AM
Clerk
Jefferson County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE JEFFERSON CIRCUIT COURT |
| | ) SS: | |
| COUNTY OF JEFFERSON | ) | CAUSE NO. _____ 39C01-1906-PL-00565 |
| | | Jefferson Circuit Court |

---

CITY OF MADISON, INDIANA,
A POLITICAL SUBDIVISION OF THE
STATE OF INDIANA, LOCATED IN
JEFFERSON COUNTY, INDIANA,
BY AND THRU ITS MAYOR AND
COMMON COUNCIL,

        Plaintiff

    VS

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK
COMPANY, INC.; ENDO HEALTH
SOLUTIONS INC.; ENDO
PHARMACEUTICALS, INC.;
SAMANTHA BEAVER; KEVIN L. FOSTER;
BRITTANY BERKSHIRE;  JOE GAY, JR.
JESSE BOBB; MICHAEL WHITE;
ELSA MARIE NEACE; GLENN MICHAEL
FIELDS; CLAUDE HOLT, JR.;
JAMES COOMER; LLOYD E. McNEAR;
CHRISTOPHER C. SMITH;  JOEL E.
BARRETT, JR; AND
DOES 1 THROUGH 100,
INCLUSIVE

        Defendants

---

## COMPLAINT

    Plaintiff, THE CITY OF MADISON, INDIANA, A POLITICAL SUBDIVISION OF
THE STATE OF INDIANA, LOCATED IN JEFFERSON COUNTY, INDIANA, BY AND
THRU ITS MAYOR AND COMMON COUNCIL, alleges as follows:



1

## I.     INTRODUCTION

1.      Defendants manufacture, market, distribute, divert and sell prescription opioids (hereinafter "opioids"), including brand-name drugs like Oxycontin and Percocet, and generics like oxycodone and hydrocodone, which are powerful narcotic painkillers. Historically, because they were considered too addictive and debilitating for the treatment of chronic pain (like back pain, migraines and arthritis), opioids were used only to treat short-term acute pain.

2.      However, by the late 1990s, and continuing today, Manufacturing Defendants, or some of them, began a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, a far broader group of patients much more likely to become addicted and suffer other adverse effects from the long-term use of opioids.  In connection with this scheme Manufacturing Defendants, or some of them, spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain. As to the risks, Manufacturing Defendants, or some of them, falsely and misleadingly, and contrary to the language of their drugs' labels: (1) downplayed the serious risk of addiction; (2) promoted the concept of "pseudoaddiction" and thus advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. Conversely, Manufacturing Defendants, or some of them, also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no "good evidence" to support Manufacturing Defendants' claims.

3.      Manufacturing Defendants, or some of them, disseminated these common messages to reverse the popular and medical understanding of opioids. They disseminated these messages directly, through their sales representatives, and in speaker groups led by physicians PURDUE and ENDO recruited for their support of Manufacturing Defendants' marketing messages. Borrowing a page from Big Tobacco's playbook, PURDUE and ENDO also worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors, known as "key opinion leaders" ("KOLs") and (b) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups"). Manufacturing Defendants PURDUE and ENDO then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, Continuing Medical Education ("CME") programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, Manufacturing Defendants PURDUE and ENDO persuaded doctors and patients that what they had long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids.

4.      Manufacturing Defendants, or some of them, knew that its misrepresentations of the risks and benefits of opioids were not supported by or were directly contrary to the scientific evidence. Indeed, the falsity of such misrepresentations has been confirmed by the U.S. Food and Drug Administration ("FDA") and the Centers for Disease Control and Prevention ("CDC"), including by the CDC in its *Guideline for Prescribing Opioids for Chronic Pain*, issued in 2016 and approved by the FDA ("2016 CDC Guideline"). Opioid

manufacturers, including Manufacturing Defendants ENDO Pharmaceuticals, Inc. and PURDUE Pharma L.P., have also entered into settlements agreements with public entities that prohibit them from making many of the misrepresentations identified in this Complaint in other jurisdictions. Yet even now, each Manufacturing Defendant, or some of them, continues to misrepresent the risks and benefits of long-term opioid use in Indiana and continues to fail to correct its past misrepresentations.

5.      Manufacturing Defendants, PURDUE and ENDO also formed a continuing opioid marketing enterprise in violation of the Indiana Deceptive Consumer Sales Act, 1.C.24-5-0.5 *et seq,* (DCAS), for the purpose of falsely and illegally promoting the widespread use of opioids for chronic pain.

6.       Manufacturing Defendants' efforts were wildly successful.  Opioids are now the most prescribed class of drugs; they generated $11 billion in revenue for drug companies in 2014 alone. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain." This epidemic, fueled by opioids lawfully prescribed by doctors, has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand). And when those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin, the illegal street sales being supplied and supported by the illegal diversion of opioids by Pharmacy Defendants and the Dealer Defendants.  In THE CITY OF MADISON this epidemic was front and center, for example:

A.  It is hardly necessary to say now that the United States is awash in opioids and engulfed in a public health crisis the likes of which have been seen before. SOUTHERN INDIANA AND THE CITY OF MADISON is at the forefront of this crisis. For example: By 2012, in Indiana alone, 106 prescriptions for opioids were written for every 100 people in the state, MacKie said, adding that as a pain-management specialist, he began to see by 2008 that "we were clearly going down the wrong path."

Studies are showing no evidence that opioids present a long-term benefit to chronic pain and, in fact, can actually impact the body's ability to heal after an injury.

"The real tragedy of this is, if [patients] were never started on opiates, four years later they were four times more likely to have recovered from their injury," MacKie said.
But in the United States, more than 12,000 people have died from opioid overdose every year for the last three years – 33,000 died in 2016 alone, MacKie said. "So, opioid addiction has killed more people in the past three years than [the number of Americans] killed during the Vietnam War."Studies show that the more pills given per prescription (and the higher the dosage per pill) will increase not only the risk of addiction, now referred to as substance abuse disorder, but also increases the risk of death from overdose.

Studies show that those prescribed 1-36 pills at a time were 15 times more likely to develop a substance abuse disorder. Those prescribed 30-120 pills at a time were nearly 30 times more likely; those prescribed more than 120 pills at a time were 122 times more likely to become addicted.
And the problem goes beyond those who are legally prescribed these drugs. About 68 percent of people 12 and older who abuse opioids obtained them for free from a friend or relative who had a prescription; an additional 11 percent had stolen the pills from friends or family.

Addiction to prescribed opiates also can lead to the abuse of illicit drugs. According to a Johns Hopkins study, one in 15 people who take opioids illicitly will try heroin within 10 years, he said.

(Emphasis Supplied, See: Madison Courier June 24, 2017)

Most doctors are untrained in pain management and yet patient satisfaction scores for physicians, maintained by the Centers for Medicare and Medicaid Services, are directly determined by patients' assessment of how well their pain was managed. That score has consequences: a low one leads to a decrease in pay. "We have an environment where doctors and hospitals feel

compelled to continue to prescribe opioids based on their bottom line," said Adams. "We still haven't accepted that overprescribing is a part of the problem to the degree that I think it clearly is." In addition, addiction treatment services have been lacking. In the entire state of Indiana, there are two or three psychiatrists specializing in addiction. "We've underfunded mental health and substance abuse for decades," Adams said.

All of what has happened since the late 1980s is potentially part of MADISON's syndemic: the sudden unemployment, the desertion of the young, the fall in rent prices, the rise of the itinerant population, the decline of infrastructure, the over prescription of pain pills, the lack of assistance. By the late 1990s and early 2000s, it seems, the town itself had become sick, the result of various forms of 'structural violence' — a term introduced by Harvard physician and anthropologist Paul Farmer to describe harmful social frameworks — along with historical, behavioral and political risk factors. The picture that emerges from this is one of a disease with many causes, including place of birth.
(Emphasis Supplied, See: http://digg.com/2016/MADISON-indiana-hiv)

B.

*The nearby City of AUSTIN, a town of about 5,000 people became home to one of the biggest outbreaks in decades, with more than 140 diagnosed cases. At the root of the outbreak was a powerful prescription painkiller called Opana. Snorting the drug instead of taking it by mouth meant avoiding the pill's time release, giving a user all the effects of the drug at onc*e. In 2012, the company that makes Opana changed the formula of the drug to prevent people from snorting it. The company made the pills hard to crush, but at this point, many people were already addicted.

*"The only way you could really do them is inject them, because if you actually swallow them, it really don't do nothing," he says. Jeff says they've figured out how to cook the reformulated version of Opana so it can be injected...*
When Opana pills are swallowed, they release their painkilling ingredient over 12 hours. If the pills were crushed and snorted, though, the drug was released in a single dose.
But the drug's manufacturer, ENDO Pharmaceuticals, reformulated Opana in 2012. The new pills featured a coating that was intended to make them more difficult to abuse by crushing them into powder or dissolving them...

For its part, ENDO has said that its decision to reformulate Opana was a well-intended attempt to prevent abuse. As the company told the Food and Drug Administration in 2012, ENDO reformulated the drug "to provide a crush-resistant product, equally as effective as Opana ER, which would discourage abuse, misuse and diversion." ENDO declined repeated requests from NPR for an interview.

*According to study data, as well as interviews with Indiana residents addicted to Opana, the reformulation effectively deterred many people from snorting the drug. But the change also led a significant number of people to abuse the drug by injection. When needles are shared, the injection route can transmit HIV, hepatitis C or other infections.*

And interviews with experts, court filings, documents from the FDA, as well as ENDO's own statements, suggest the company's decision to reformulate Opana was also motivated in large part by financial interests. So why did ENDO Pharmaceuticals reformulate the drug in the first place. The answer involves both public health concerns and business considerations.ENDO Pharmaceuticals released Opana in 2006. Taken orally, Opana is about twice as powerful as OxyContin, and the company says it is "indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment."

Soon afterward, though, communities around the country began reporting abuse of  Opana and even overdose deaths. ENDO said those concerns over public health and abuse were key motivations to reformulate the drug. Opana also was a major moneymaker for the company.

In 2011, for example, Opana generated $384 million in net sales for ENDO, accounting for 14 percent of the company's total revenue that year. But the company also faced the threat of generic competition. So ENDO developed a strategy that would block its competitors and maintain Opana's share of the market. The company reformulated the drug, this time with features designed to prevent abuse, a move that could potentially protect ENDO at a time it faced the loss of patent protection.

The FDA approved ENDO's reformulated Opana, and in 2012 the company began replacing the old versions of Opana on pharmacy shelves. In August of that year, ENDO took another step. The company filed a petition with the FDA, arguing that it had removed the old, crushable version of Opana from the market "for reasons of safety or effectiveness." It also asked the agency to "refuse to approve" and "suspend and withdraw the approval" of generic, noncrush-resistant versions of Opana.

If the FDA agreed with ENDO, the agency would effectively eliminate the company's generic competition. "We see this again and again in the pharmaceutical industry," says Dr. Anna Lembke, an assistant professor of psychiatry at Stanford University Medical Center. "They come up with some new fancy formulation of basically the same old drug ... and then that way they have a new drug that they can charge a lot of money for."
For example, in 2010, PURDUE Pharma reformulated its popular opioid painkiller OxyContin to make the drug crush-resistant. The FDA later

7

determined that the reformulated version of OxyContin was significantly safer and that "the benefits of original OxyContin no longer outweigh its risks. "The agency then blocked generic, noncrush-resistant versions of OxyContin. Dr. Andrew Kolodny, executive director of Physicians for Responsible Opioid Prescribing and a prominent critic of the drug industry, says this type of decision "is worth billions to a pharmaceutical company. "In 2012, while ENDO's petition was pending FDA's decision, the company filed a lawsuit in U.S. District Court for the District of Columbia to compel the agency to speed up the review. ENDO's lawyers predicted a "spike of misuse and abuse" if generic — and noncrush-resistant — versions of Opana hit the market.

"With the reformulation, snorting appears to be much, much lower, whereas injection appears to be the more preferred route," Theresa Cassidy, the study's lead author, told NPR in a phone interview. Still, Cassidy, a vice president of analytics at a company called Inflexxion, warns that it's not possible to draw a causal link between the reformulation and injection abuse based simply on these data. (Inflexxion is paid by pharmaceutical companies, including ENDO, to conduct research into drug abuse patterns but says it maintains independence.)
A separate study also looked at abuse data before and after Opana's reformulation. Though the sample size was small, the study found "a trend toward increases in IV [intravenous] use after the reformulation."

*Back in Austin, Ind., local, state and federal law enforcement have struggled to eliminate Opana from the town's illegal-drug market. A recent drug bust helped reduce the amount of Opana available on the street. But drug users there still describe Opana as the most desirable drug around.*

A single Opana pill, they say, now costs about $200, up from around $140 when we started reporting this story.

(Emphasis Supplied, See:  http://www.npr.org/sections/health-shots/2016/03/31/469525114/inside-a-small-brick-house-at-the-heart-of-indianas-opioid-crisis

C.  Health officials say the HIV epidemic centered in JEFFERSON COUNTY was fueled by addicts sharing needles to shoot up Opana.  It's a powerful pain killer, prescribed by doctors.  "We've restricted the access and the abuse of prescription drugs," Indiana Attorney General Greg Zoeller said during a press conference in JEFFERSON COUNTY Tuesday. He says his office has shut down so-called 'pill mills' and gone after doctors who over-prescribe and now a shortage of painkillers is causing a demand for heroin. *But local health officials estimate roughly 85 percent of the people using the needle exchange in Austin are still addicted to Opana. "Until we turn from six to twelve about the drug problem.* "We're just struggling everyday to do the best

8

we can with what we have."*(officers) I just can't see us making a big difference or putting a big dent in it," Spicer said*
(Emphasis Supplied, See: http://www.wdrb.com/story/30494825/police-opana-still-drug-of-choice-for-addicts-in-AUSTIN-indiana

D.   Last year, JEFFERSON COUNTY experienced an HIV outbreak that health officials attributed to sharing drug needles. It is believed users crushed the pill and made it into a liquid form before injecting it. Friday's investigation is partly in response to the increase in HIV cases. *Typically, JEFFERSONCOUNTY sees about 10 cases of HIV annually; in the last 13 months, 188 cases have been reported.*
(Emphasis supplied, See: http://fox59.com/2016/02/05/dea-local-authorities-conduct-drug-raid-in-JEFFERSON-co-in-response-to-hiv-spike-10-people-in-custody

E.   Opioids are not confined by geography. Austin is but a microcosm of the Indiana opioid epidemic with 1152 overdose deaths in 2014, Indiana ranks 15th in the nation. The number of deaths from drug overdoses has increased dramatically in the state since 1999, more than 500%. Marion County, less than a hour away from Austin, has the most overdose deaths and non-fatal emergency room visits due to overdose of any county in the state. The number and rate of Marion County deaths from drug use has increased steadily since 2000. • Infants exposed to opioids *in utero* are often born with Neonatal Abstinence Syndrome (NAS), a condition that can result in increased irritability, hypertonia (spasticity), tremors, difficulty eating, vomiting, watery stools, seizures and respiratory distress. Nationally, the incidence of NAS rose three-fold between the years 2000 and 2009.

In Indiana, 657 infants were born with NAS in 2014. Infants with NAS require long and costly hospital stays after birth. • Drug abuse by parents often has a negative impact on children.  In 2013, Indiana saw a 30% increase in the number of children entering the welfare system, primarily because of parental substance abuse.  In that same year, the Marion County Juvenile Court saw a sharp increase in the number of children taken from their homes and placed in protective custody due to parental addiction. Cases in which parental rights were terminated grew by 31%.

Needle sharing among people who inject opioids and heroin can result in transmission of HIV and hepatitis B and C. It is estimated that 50 to 80% of people who inject drugs will contract one of these viruses within five years of beginning injection drug use. • Additional emergency and public safety personnel are needed to respond to the increase in overdose calls that have occurred over the past five years. *Indianapolis Emergency Management Services reported a 117% increase in the number of calls between 2011 and 2015. The Indianapolis Metropolitan Police Department experienced an*

*increase of 306% in calls about narcotics during the same period.  • There has been an increase in hospital Emergency Department (ED) visits resulting from abuse of opioids and heroin.*  In 2010 alone there were 641,940 visits to Indiana EDs due to non-fatal poisonings (90% of those poisonings were due to drug abuse).  Not only do those visits have a dollar amount attached to them, but they also impact the ability of hospitals to deliver timely care.

*The financial cost to society on a national level has been estimated at $55.7 billion (2007), with $25 billion attributable to healthcare costs, $25.6 billion in lost workplace productivity and $5.1 billion in criminal justice costs.*  Interestingly, of the total, only a miniscule 0.3% was spent on researching the problem and only 0.3% was spent on prevention.  *Drug abuse puts significant strain on the criminal justice system.  The cost nationally for prescription opioid abuse alone among the prison population has been estimated at $5.1 billion.  In Indiana, 53% of people who are incarcerated are diagnosed with a substance use disorder.  Of people who return to prison, 75% have a substance abuse disorder.  • Drug abuse presents workplace safety and productivity issues.*  A first of its kind survey conducted by the National Safety Council and the Indiana Attorney General's office found that 80% of Indiana's employers have observed prescription drug misuse in their employees.  The survey also found that 64% of employers perceive prescription drugs to present a bigger problem in the workplace than illegal substances.

*Indiana ranks 9th out of 50 states in 2012. The number of painkillers (opioids) per 100 people was 96-143. JEFFERSON COUNTY had the worst health status for years preceding the opioid epidemic, so it was no surprise that opioid injection resulted in the rapid and unchecked spread of h\HIV.*

(Emphasis Supplied, See: https://www.inphilanthropy.org/sites/default/files/Richard%20M.%20Fairbanks%20Opioid%20Report%202016.pdf)

F.   JEFFERSON COUNTY, Indiana has 218 individuals with HIV. These numbers based on county size are the worst in the United States. It is comparable to the statistics in Africa. A 2009 epidemiology report prepared by the Indiana University Center for Health Policy shows that the per capita dosage units for JEFFERSON COUNTY is 40.3.

The geographical proximity of the MADISON to the opioid epidemic facilitated the

spread of opioid abuse to its neighbors, including the CITY OF MADISON. You will find

similar statistics in communities like Madison, Indiana and the effects on their local

government and resources are the same.  But even these alarming statistics do not fully illustrate the toll of prescription opioid abuse on patients and their families, as the dramatic increase in opioid prescriptions to treat chronic pain has resulted in a population of addicts who seek drugs from doctors. Efforts by physicians to reverse course for a chronic pain patient with long term dependence on opioids are often thwarted by a secondary criminal market well-stocked by a pipeline of drugs that are

diverted to supply these patients.

7.      Prescription opioid abuse has not displaced heroin, but rather triggered a resurgence in its use, imposing additional burdens on agencies that address heroin use and addiction. Individuals who are addicted to prescription opioids often transition to heroin (and the resulting spread of HIV) because it is a less expensive, readily available alternative that provides a similar high.

8.      Chronic pain takes an enormous toll on their health, lives and families. These patients deserve both appropriate care and the ability to make decisions based on accurate, complete information about treatment risks and benefits. But Manufacturing Defendants' or some of their deceptive marketing campaign deprived Indiana patients and their doctors of the ability to make informed medical decisions and, instead, caused important, sometimes life-or-death decisions to be made based not on science, but on hype. Manufacturing Defendants deprived patients, their doctors, and health care payors of the chance to exercise informed judgment and subjected them to enormous costs and suffering. Manufacturing Defendants' conduct has also exacted, and foreseeably so, a financial burden on  THE CITY OF MADISON, which has spent  tax dollars  on costs directly attributable to the flood of opioids  Manufacturing Defendants unleashed on the City, including costs for addiction treatment and the treatment of babies born addicted to opioids.

11

9.      To redress and punish these violations of law, Plaintiff seeks damages for the amounts paid in connection with the results of opioid abuse, including but not limited to City law enforcement, EMS, addiction treatment costs, and the like.  Plaintiff also seeks a declaration that Manufacturing Defendants' conduct has violated Indiana law, an order requiring Manufacturing Defendants to cease their unlawful promotion of opioids and correct their misrepresentations and an order requiring Manufacturing Defendants to abate the public nuisance they have created and knew their actions would create.  Plaintiff also seeks punitive damages, treble damages, and attorneys' fees and costs, in addition to granting any other equitable relief authorized by law. Manufacturing Defendants' conduct has also exacted, and foreseeably so, a financial burden on THE CITY OF MADISON. The City budget has been plagued with additional demands for public services attributable to the flood of opioids Manufacturing Defendants unleashed on the City, including costs for addiction treatment and the treatment of babies born addicted to opioids. Further, damages and equitable relief is sought on behalf of all CITY OF MADISON citizens who or which have sustained damages or losses as a result of opioid abuse.

## II.      JURISDICTION AND VENUE

10.      This Court has personal jurisdiction over all Defendants as they conduct business in Indiana, purposefully direct or directed their actions toward Indiana, and/or have the requisite minimum contacts with Indiana necessary to constitutionally permit the CITY OF MADISON to exercise jurisdiction.

Venue is proper in CITY OF MADISON as to all Defendants as they routinely conduct business in CITY OF MADISON and that the harm and injuries caused by their conduct was visited upon CITY OF MADISON and its citizens.

III.   **PARTIES**

11.      **Plaintiff,** CITY OF MADISON, INDIANA, A POLITICAL SUBDIVISION
OF THE STATE OF INDIANIA is authorized to bring this action pursuant the Laws of the
State of Indiana, including but not limited to Indiana Code 36-1-3-2.

12.      **The Defendants are:**

A.      PURDUE PHARMA L.P. is a limited partnership organized under the laws of
Delaware. PURDUE PHARMA INC. is a New York corporation with its principal place of
business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY is a
Delaware corporation with its principal place of business in Stamford, Connecticut
(collectively, **"Manufacturing Defendant" or "PURDUE"**).

PURDUE manufactures, promotes, sells, and distributes opioids such as
OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the
U.S. and Indiana. OxyContin is PURDUE's best-selling opioid.  Since 2009, PURDUE's annual
sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from
its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for
analgesic drugs (painkillers).

B.      ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its
principal place of business in Malvern, Pennsylvania ENDO PHARMACEUTICALS INC. is a
wholly- owned subsidiary of ENDO Health Solutions Inc. and is a Delaware corporation with
its principal place of business in Malvern, Pennsylvania. (ENDO Health Solutions Inc. and
ENDO Pharmaceuticals Inc. are collectively referred to as **"Manufacturing Defendant" or
"ENDO."**)

ENDO develops, markets, and sells and has sold prescription drugs, including

the opioids,  Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and Indiana.

Opioids made up roughly $403 million of ENDO's overall revenues of $3 billion in 2012.

Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of

ENDO's total revenue in 2012. ENDO also manufactures and sells generic opioids such as

oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Indiana.

      C.     SAMANTHA BEAVER is a person of the full age of majority whose address is

8865 Chessie Drive, Indianapolis, Indiana. On July21, 2017, the Indiana Board of Pharmacy,

entered Findings of Fact and Order revoking this Defendant's pharmacy technician license. The

Board earlier found that the Defendant posed a clear and present danger to the public health and

safety if allowed to practice as a pharmacy technician. The action of the Board was based on

Defendant's admission to the diversion from her pharmacy employer of nearly 1300 opioid and

other controlled substance tablets beginning in April, 2016 and ending not later than December

31, 2016. ((SEE: Cause Number: 2017 IBP 0001, annexed as Exhibit A);

      KEVIN L. FOSTER is a person of the full age of majority whose address is 1015

Gallium Drive, Cicero, Indiana. On July21, 2017, the Indiana Board of Pharmacy, entered its

Final Order revoking this Defendant's pharmacist license by Agreement. The Board found that

the Defendant posed a clear and present danger to the public health and safety if allowed to

practice as a pharmacist. The action of the Board was based on Defendant's admission to the

criminal diversion and distribution of Norco, an opioid. (SEE: Cause Number: 2016 IBP 0038,

annexed as Exhibit B); and

      BRITTANY BERKSHIRE is a person of the full age of majority whose address is 115

18th Street, Logansport, Indiana. On July 21, 2017, the Indiana Board of Pharmacy, entered

Findings of Fact and Order revoking this Defendant's pharmacy technician license. The Board

earlier found that the Defendant posed a clear and present danger to the public health and safety if allowed to practice as a pharmacy technician. The action of the Board was based on Defendant's admission that she diverted opioids. As a result of her conduct, she was criminally charged in Cass Superior Court, (SEE: Cause Number: 2017 IBP 0006, annexed as Exhibit C) and are collectively referred to herein as **"Pharmacy Defendants"**.

JOE GAY, JR. is a person of the full age of majority whose address is160 Paulanna Avenue, MADISON, IN, 47102. On July 11, 2016, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, to wit: Hydrocodone, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1503-FB-14, (Exhibit D, annexed).

JESSE BOBB is a person of the full age of majority whose address is 1085 N.Co.Ld. 800 E., Seymour, IN, 47274. On August 1, 2016, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, to wit: Opana, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1503-FB-15, (Exhibit E, annexed).

MICHAEL WHITE is a person of the full age of majority whose address is presently unknown. On July 29, 201, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1503-FB-13, (Exhibit F, annexed).

ELSA MARIE NEACE is a person of the full age of majority whose address is 430 S. Morgan Drive, MADISON, IN, 47102. On November 14, 2015, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, to wit: Acetaminophen/Hydrocodone, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1503-F3-2, (Exhibit G, annexed).

GLENN MICHAEL FIELDS is a person of the full age of majority whose address is 1317 U.S. 31, Apartment 3, MADISON, IN, 47102. On June 23, 2015, a Judgment of Conviction

for Dealing in Controlled Dangerous Substances, to wit: Oxycodone, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1501-FB-1, (Exhibit H, annexed).

CLAUDE HOLT, JR. is a person of the age of majority whose address is 917 W. York Road Lot # 51, MADISON, IN, 47102. On July 20, 2015, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, to wit: Oxycodone, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1501-FB-7, (Exhibit I, annexed).

JAMES COOMER is a person of the age of majority whose address is 1103 W.York Road, MADISON, IN, 47102. On June 30, 2015, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, to wit: Opana, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1501-FB-6, (Exhibit J, annexed).

LLOYD E. McNEAR is a person of the age of majority whose address is 1301 W. York Road, Lot # 106, MADISON, IN, 47102. On July 20, 2015, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, to wit: Oxycodone, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1501-FB-7, (Exhibit K, annexed).

CHRISTOPHER C. SMITH is a person of the age of majority whose address is presently unknown. On January 23, 2017, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, to wit: Opana, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1304-FA-13, (Exhibit M, annexed).

JOEL E. BARRETT, JR. is a person of the age of majority whose address is 1020 E. Harrod Road, MADISON, In, 47102. On October 6, 2015, a Judgment of Conviction for Dealing in Controlled Dangerous Substances, to wit: Opana, was entered IN THE SCOTT CIRCUIT COURT, CAUSE NO: 72C01-1504-FA-6, (Exhibit N, annexed) and are collectively referred to herein as **"Dealer Defendants"**.

By their diversionary, illegal conduct, the Pharmacy Defendants and the Dealer Defendants were able to ensure that there was a readily illegal opioid drug supply available in the State of Indiana and JEFFERSON County fueling and supporting the opioid epidemic, resulting in the harm and damages visited upon the Plaintiff as alleged hereinbelow.

D.      DOES 1 THROUGH 100, INCLUSIVE. The CITY OF MADISON lacks information sufficient to specifically identify the true names or capacities, whether individual, corporate or otherwise, of the Manufacturing Defendants sued herein under the fictitious names DOES 1 through 100 inclusive, and they are therefore sued herein pursuant to.   The CITY OF MADISON will amend this Complaint to show their true names and capacities if and when they are ascertained. The CITY OF MADISON is informed and believes, and on such information and belief alleges, that each of the Manufacturing Defendants named as a DOE is responsible in some manner for the events and occurrences alleged in this Complaint and is liable for the relief sought herein.

IV.     **FACTUAL ALLEGATIONS**

13.      Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

14.      To take advantage of the lucrative market for chronic pain patients, Defendant, PURDUE and ENDO developed or was the beneficiary, i.e.

17

AMERISOURCEBERGEN and MCKESSON, of a well-funded marketing scheme based on deception.  PURDUE and ENDO used both marketing and unbranded advertising disseminated by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use – statements that benefited not only themselves and the third-parties, such as AMERISOURCEBERGEN and MCKESSON, who gained legitimacy when PURDUE and ENDO repeated those statements.  Yet these statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence. They also targeted susceptible prescribers and vulnerable patient populations.

**A.    Manufacturing Defendants Used Multiple Avenues To Disseminate Their False And Deceptive Statements About Opioids.**

15.    Manufacturing Defendants, PURDUE and ENDO, spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in Indiana.  Manufacturing Defendants, PURDUE and ENDO, also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the United States.

**1.    Manufacturing Defendants, PURDUE and ENDO,   spread and continue to spread their false and deceptive statements through direct marketing of their branded opioids.**

16.    Manufacturing Defendants', PURDUE and ENDO, direct marketing of opioids generally proceeded on two tracks. First, each of these Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of their branded drugs.  For example, the opioid industry spent more than $14 million on medical journal

advertising of opioids in 2011, nearly triple what they spent in 2001. This amount included $8.3 million by PURDUE, $4.9 million and $1.1 million by ENDO.

17.      Branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, ENDO distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker and chef, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. PURDUE also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. ENDO and PURDUE agreed in late 2015 and 2016 to halt these misleading representations in New York, but they may continue to disseminate them in Indiana.

18.      Second, each Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. Manufacturing Defendants have not corrected this misinformation. Instead, each Defendant devoted and continues to devote massive resources to direct sales contacts with doctors.  In 2014 alone, the opioid industry spent $168 million on detailing branded opioids to doctors. This amount is twice as much as was spent on detailing in 2000. The amount includes $108 million spent by PURDUE, $10 million by ENDO.

19.      Industry detailers have been reprimanded for their deceptive promotions. A July 2010 "Dear Doctor" letter mandated by the FDA required Actavis to acknowledge to the doctors to whom it marketed its pioid drug that "[b]etween June 2009 and February 2010,

Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

20.   Manufacturing Defendants, PURDUE and ENDO, also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Manufacturing Defendants, PURDUE and ENDO. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Manufacturing Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Manufacturing Defendants', PURDUE and ENDO, prior misrepresentations about the risks and benefits of opioids.

21.   Manufacturing Defendants, PURDUE and ENDO, detailing to doctors is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Even without such studies, Manufacturing Defendants , PURDUE and ENDO,  purchase, manipulate and analyze some of the most sophisticated data available in *any* industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. Thus,

Manufacturing Defendants, PURDUE and ENDO, *know* their detailing to doctors is effective an all of which inures to the benefit of others, such as AMERISOURCEBERGEN and MCKESSON. Manufacturing Defendants, PURDUE and ENDO, employed the same marketing plans and strategies and deployed the same messages in Indiana as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Manufacturing Defendants', PURDUE and ENDO, messages are accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising. Manufacturing Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs. In more simplistic terms, the overstatement of opioid benefit by one manufacturer or distributor, benefits all.

22.     Manufacturing Defendants, such as PURDUE and ENDO,  ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. Manufacturing Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

**2.     Manufacturing Defendants, PURDUE and ENDO,  used a diverse group of seemingly independent third parties to spread false and deceptive statements about the risks and benefits of opioids.**

23.     Manufacturing Defendants, PURDUE and ENDO, also deceptively marketed

opioids in Indiana through unbranded advertising – *i.e.*, advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, these Manufacturing Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Manufacturing Defendants, PURDUE and ENDO, controlled the distribution of their "core messages" via their own detailers and speaker programs, Manufacturing Defendants, PURDUE and ENDO, similarly controlled the distribution of these messages in scientific publications, treatment guidelines, CMEs, and medical conferences and seminars. To this end, Manufacturing Defendants, PURDUE and ENDO, used third-party public relations firms to help control those messages when they originated from third-parties.

24.     Manufacturing Defendants, PURDUE and ENDO, also marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not reviewed by the FDA. Manufacturing Defendants al, PURDUE and ENDO, so used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, Manufacturing Defendants, PURDUE and ENDO, used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long- term opioid use for chronic pain.

25.     Manufacturing Defendants', PURDUE and ENDO, deceptive unbranded marketing often contradicted what they said in their branded materials reviewed by the FDA. For example, ENDO's unbranded advertising contradicted its concurrent, branded advertising

for Opana ER:

| Pain: Opioid Therapy<br><br>(Unbranded) | Opana ER Advertisement<br><br>(Branded) |
|---|---|
| "People who take opioids **as prescribed usually do not become addicted**." | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**." |

a.      Key Opinion Leaders ("KOLs")

26.     Manufacturing Defendants also spoke through a small circle of doctors who, upon information and belief, were selected, funded, and elevated by PURDUE and ENDO because their public positions supported the use of opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs."

27.     PURDUE and ENDO paid KOLs to serve as consultants or on their advisory boards and to give talks or present CMEs, and their support helped these KOLs become respected industry experts. As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying PURDUE and ENDO by advancing their marketing goals. KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by PURDUE and ENDO.

28.     KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. PURDUE and ENDO created opportunities for KOLs to participate in research studies PURDUE and ENDO suggested or chose and then cited and promoted favorable studies or articles by their KOLs. By

contrast, PURDUE and ENDO did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

29.     PURDUE and ENDO's KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. PURDUE and ENDO were able to direct and exert control over each of these activities through their KOLs. The 2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

30.     Pro-opioid doctors are one of the most important avenues that PURDUE and ENDO use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. PURDUE and ENDO know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with PURDUE that the PURDUE website *In the Face of Pain* failed to disclose that doctors who provided testimonials on the site were paid by PURDUE and concluded that PURDUE 's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

31.     Thus, even though some of PURDUE and ENDO' KOLs have recently moderated or conceded the lack of evidence for many of the claims they made, those admissions did not reverse the effect of the false and deceptive statements that continue to appear nationwide and throughout the State of Indiana in PURDUE and ENDO' own marketing as well as treatment guidelines, CMEs and other seminars, scientific articles and research, and other publications available in paper or online.

32.     All of these efforts by PURDUE and ENDO fostered a belief in the medical community as to the safety and efface of opioids, albeit a false belief, increasing the medical use of opioids inuring to the financial benefit of all Manufacturing Defendants herein.

33.     PURDUE and ENDO utilized many KOLs, including many of the same ones. Two of the most prominent are described below.

**(1)     Russell Portenoy**

34.     Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom PURDUE and ENDO identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, ENDO, Janssen, and PURDUE (among others), and was a paid consultant to Cephalon and PURDUE.

35.     Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009.  He was also a member of the board of the

American Pain Foundation ("APF"), an advocacy organization almost entirely funded by PURDUE and ENDO.

36.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations.  He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast in Indiana and across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon.  If a person does not have a history, a personal history, of substance

abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[14]

37.     To his credit, Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that fewer than 1% of patients would become addicted to opioids.  According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks.  Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[15]  Portenoy candidly stated: "Did I teach about

pain management, specifically about opioid therapy, in a way that reflects misinformation?

Well, . . . I guess I did."

(2)     **Lynn Webster**

38.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr.

Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy. He is a Senior Editor of *Pain Medicine*, the same journal that published ENDO special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by ENDO and PURDUE . At the same time, Dr. Webster was receiving significant funding from PURDUE and ENDO (including nearly $2 million from Cephalon).

39.     During a portion of his time as a KOL, Dr. Webster was under investigation for

overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

40.     Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by PURDUE and ENDO,

41.     In 2011, Dr. Webster presented, via webinar, a program sponsored by PURDUE titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk.* Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach Indiana doctors.

42.     Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids. As he and his co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), a book that is still available online, when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response." ENDO distributed this book to doctors. Years later, Dr. Webster reversed himself,

acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."

b.       **Front Groups**

43.     PURDUE and ENDO also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of PURDUE and ENDO, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted PURDUE and ENDO by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by PURDUE and ENDO.

44.     These Front Groups depended on PURDUE and ENDO for funding and, in some cases, for survival. PURDUE and ENDO also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, PURDUE and ENDO made sure that the Groups would generate only the messages PURDUE and ENDO wanted to distribute. Despite this, the Front Group held itself out to be independent while serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

45.     PURDUE and ENDO utilized many Front Groups, including many of the same ones. Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation

("NPF") and Pain & Policy Studies Group ("PPSG").

    **(1)**    **American Pain Foundation ("APF")**

    46.    The most prominent of PURDUE and ENDO' Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. ENDO alone provided more than half that funding; PURDUE was next, at $1.7 million.

    47.    APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Citizens of the CITY OF MADISON.

    48.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from PURDUE and ENDO and others to avoid using its line of credit. As one of its board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest problems at APF.

    49.    APF held itself out as an independent patient advocacy organization. It often

engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide "patient representatives" for PURDUE and ENDO' promotional activities, including for PURDUE's *Partners Against Pain* and Janssen's *Let's Talk Pain*. APF functioned largely as an advocate for the interests of PURDUE and ENDO, not patients. Indeed, as early as 2001, PURDUE told APF that the basis of a grant was PURDUE's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

50.    In practice, APF operated in close collaboration with opioid makers. On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

51.    APF assisted in other marketing projects for drug companies. One project funded by another drug company – *APF Reporter's Guide: Covering Pain and Its Management* (2009) – recycled text that was originally created as part of the company's training document.

52.    The same drug company made general grants, but even then it directed how APF used them. In response to an APF request for funding to address a potentially damaging state Medicaid decision related to pain medications generally, the company representative responded, "I provided an advocacy grant to APF this year – this would be a very good issue on which to use some of that.  How does that work?"

53.    APF's clear lack of independence – in its finances, management, and mission – and its willingness to allow PURDUE and ENDO to direct its activities and messages support an inference that each Defendant that worked with it was able to exercise editorial control

over its publications.

54.    Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and PURDUE and ENDO stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."

### (2)    American Academy of Pain Medicine ("AAPM")

55.    The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of PURDUE and ENDO, issued treatment guidelines and sponsored and hosted medical education programs essential to PURDUE and ENDO' deceptive marketing of chronic opioid therapy.

56.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. PURDUE and ENDO were members of the council and presented deceptive programs to doctors who attended this annual event.

57.     AAPM is viewed internally by ENDO as "industry friendly," with ENDO advisors and speakers among its active members. ENDO attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation. Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."

58.     AAPM's staff understood they and their industry funders were engaged in a common task. PURDUE and ENDO were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

59.     In addition, treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. They are relied upon by doctors, especially the general practitioners and family doctors targeted by PURDUE and ENDO, who are generally neither experts nor trained in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by ENDO and PURDUE discussed treatment guidelines with doctors during individual sales visits.

60.     In 1997, AAPM and the American Pain Society jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to

32

treat chronic pain and claimed that the risk that patients would become addicted to opioids was low. The co-author of the statement, Dr. Haddox, was at the time a paid speaker for PURDUE. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and was taken down from AAPM's website only after a doctor complained, though it lingers on the internet elsewhere.

61.     AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from ENDO and PURDUE .

62.     The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including PURDUE and ENDO, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated in Indiana during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

63.     PURDUE and ENDO widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

64.     PURDUE and ENDO worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, PURDUE and ENDO combined their efforts through the Pain Care Forum (PCF), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (ENDO and PURDUE) and various Front Groups, almost all of which received substantial funding from PURDUE and ENDO. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which PURDUE and ENDO determined would reduce prescribing.

## A. PURDUE and ENDO' Marketing Scheme Misrepresented The Risks And Benefits Of Opioids.

65.     To convince doctors and patients in Indiana that opioids can and should be used to treat chronic pain, PURDUE and ENDO had to convince them that long-term opioid use is both safe and helpful. Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, PURDUE and ENDO made claims that were not supported by or were contrary to the scientific evidence. Even though pronouncements by and guidance from the FDA and the CDC based on that evidence confirm that their claims were false and deceptive, PURDUE and ENDO have not corrected them, or instructed their KOLs or Front Groups to correct them, and continue to spread them today.


### 1.     PURDUE and ENDO falsely trivialized or failed to disclose the known risks of long- term opioid use.

66.     To convince doctors and patients that opioids are safe, PURDUE and ENDO deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked

by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. PURDUE and ENDO have not only failed to correct these misrepresentations, they continue to make them today.

67.     PURDUE and ENDO falsely claimed that the risk of addiction is low and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Some illustrative examples of these false and deceptive claims are described below:

> a. PURDUE co-sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which instructed that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online.

> b. ENDO sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another ENDO website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

> c. ENDO distributed a pamphlet with the ENDO logo entitled *Living with Someone with Chronic Pain*, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the ENDO website www.opana.com.

     d. PURDUE sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]." This publication is still available online.

     e. Detailers for PURDUE and ENDO, minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse- deterrent formulations; and routinely did not correct the misrepresentations noted above.

68.    These claims are contrary to longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."

69.    The FDA further exposed the falsity of PURDUE and ENDO' claims about the low risk of addiction when it announced changes to the labels for ER/LA opioids in 2013 and for IR opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

70.     The warnings on PURDUE and ENDO' own FDA-approved drug labels caution that opioids "expose[] users to risks of addiction, abuse and misuse, which can lead to overdose and death," that the drugs contain "a substance with a high potential for abuse," and that addiction "can occur in patients appropriately prescribed" opioids.

71.     The State of New York, in a 2016 settlement agreement with ENDO, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." ENDO had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree patients treated with prolonged opioid medicines usually do not become addicted," but the State found that ENDO had no evidence for that statement. Consistent with this, ENDO agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. ENDO remains free, however, to make those statements in Indiana.

72.     PURDUE and ENDO falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. PURDUE and ENDO called this phenomenon "pseudoaddiction" – a term coined by Dr. David Haddox, who went to work for PURDUE, and popularized by Dr. Russell Portenoy, a KOL for ENDO and PURDUE, and others – and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Some illustrative examples of these deceptive claims are described below:

     a.      PURDUE co-sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of

pseudoaddiction, rather than true addiction. Responsible Opioid Prescribing remains for sale online. The 2012 edition, which also remains available online, continues to teach that pseudoaddiction is real.

b.      **ENDO** sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain.   It substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

c.      PURDUE published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

d.      PURDUE sponsored a CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long- acting opioid.

73.     The 2016 CDC Guideline rejects the concept of pseudoaddiction. The Guideline nowhere recommends that opioid dosages be increased if a patient is not experiencing pain relief. To the contrary, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer- term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

74.     ENDO has effectively repudiated the concept of pseudoaddiction. In finding

that "[t]he pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents," the State of New York, in its 2016 settlement with ENDO, reported that "ENDO's Vice President for Pharmacovigilance and Risk Management testified that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'" Consistent with this, ENDO agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York. ENDO, however, remains free to do so in Indiana.

75.     PURDUE and ENDO falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because PURDUE and ENDO aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. PURDUE and ENDO' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain.  Some illustrative examples of these deceptive claims are described below:

a.     ENDO paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of ENDO's speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

b.     PURDUE sponsored a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c.　　As recently as 2015, PURDUE has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

76.　　Once again, the 2016 CDC Guideline confirms the falsity of these misrepresentations. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

77.　　To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, PURDUE and ENDO falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

78.　　For example, a CME sponsored by ENDO, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days. And PURDUE sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.

79.　　PURDUE and ENDO deceptively minimized the significant symptoms of opioid withdrawal-which, as explained in the 2016 CDC Guideline, include drug cravings,

anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction — and grossly understated the difficulty of tapering, particularly after long-term opioid use. Yet the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response.

The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

80.    PURDUE and ENDO falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to PURDUE and ENDO' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief.  Some illustrative examples are described below:

    a.    PURDUE co-sponsored *APF's Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients

"need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available for sale online.

b.     ENDO sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

c.     ENDO distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was available during the time period of this Complaint on ENDO's website. In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."

d.     PURDUE 's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

e.     PURDUE sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages. This publication is still available online.

f.     PURDUE sponsored a CME entitled *Overview of Management Options* that is still available for CME credit. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

g.     PURDUE presented a 2015 paper at the College on the Problems of Drug Dependence, the "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.

81.     These claims conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is

now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC also states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

82.    The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

83.    PURDUE and ENDO' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.[20]

84.    More specifically, PURDUE and ENDO have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, ENDO's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. This claim was false. The FDA warned in a 2013 letter that there was no evidence ENDO's design "would provide a reduction in oral, intranasal or intravenous abuse." Moreover, ENDO's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

85.    In a 2016 settlement with the State of New York, ENDO agreed not to make

statements in New York that Opana ER was "designed to be, or is crush resistant." The State

found those statements false and deceptive because there was no difference in the ability to

extract the narcotic from Opana ER. Similarly, the 2016 CDC Guideline states that "[n]o

studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy

for deterring or preventing abuse," noting that the technologies – even when they work – "do

not prevent opioid abuse through oral intake, the most common route of opioid abuse, and

can still be abused by nonoral routes."

86.     These numerous, longstanding misrepresentations of the risks of long-term

opioid use spread by PURDUE and ENDO successfully convinced doctors and patients to

discount those risks.


**2.     PURDUE and ENDO grossly overstated the benefits of chronic opioid therapy.**

87.   To convince doctors and patients that opioids should be used to treat chronic

pain, PURDUE and ENDO also had to persuade them that there was a significant upside to

long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient

evidence to determine the long-term benefits of opioid therapy for chronic pain." In fact, the

CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function

versus no opioids for chronic pain with outcomes examined at least 1 year later (with most

placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were

more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has

recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that

it was "not aware of adequate and well-controlled studies of opioids use longer than 12

weeks." Despite this, PURDUE and ENDO falsely and misleadingly touted the benefits of

long-term opioid use and falsely and misleadingly suggested that these benefits were supported

by scientific evidence. Not only have PURDUE and ENDO failed to correct these false and

deceptive claims, they continue to make them today.

88.   For example, PURDUE and ENDO falsely claimed that long-term opioid

use improved patients' function and quality of life.  Some illustrative examples are

described below:

a.   ENDO distributed advertisements that claimed that the use of
Opana ER for chronic pain would allow patients to perform
demanding tasks like construction work or work as a chef and
portrayed seemingly healthy, unimpaired subjects.

b.   PURDUE ran a series of advertisements for OxyContin in 2012 in
medical journals entitled "Pain vignettes," which were case
studies featuring patients with pain conditions persisting over
several months and recommending OxyContin for them. The ads
implied that OxyContin improves patients' function.

c.   *Responsible Opioid Prescribing* (2007), sponsored and distributed
by ENDO and PURDUE, among other taught that relief of pain by
opioids, by itself, improved patients' function.  The book remains
for sale online.

d.   PURDUE co-sponsored APF's *Treatment Options: A Guide for
People Living with Pain* (2007), which counseled patients that
opioids "give [pain patients] a quality of life we deserve." The
guide was available online until APF shut its doors in 2012.

e.   ENDO's NIPC website *painknowledge.com* claimed in 2009 that
with opioids, "your level of function should improve; you may
find you are now able to participate in activities of daily living,
such as work and hobbies, that you were not able to enjoy when
your pain was worse." Elsewhere, the website touted improved
quality of life (as well as "improved function") as benefits of
opioid therapy. The grant request that ENDO approved for this
project specifically indicated NIPC's intent to make misleading
claims about function, and ENDO closely tracked visits to the site.

f.   ENDO was the sole sponsor, through NIPC, of a series of CMEs
titled *Persistent Pain in the Older Patient*, which claimed that
chronic opioid therapy has been "shown to reduce pain and

improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

g.      PURDUE sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health- related quality of life for chronic pain patients." The Policymaker's Guide was originally published in 2011 and is still available online today.

h.      PURDUE 's and ENDO's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

89.    These claims find no support in the scientific literature. The FDA and other federal agencies have made this clear for years. Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is <u>no good evidence</u> that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely." (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

90.    The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

46

91.     The 2016 CDC Guideline was not the first time a federal agency repudiated

PURDUE and ENDO' claim that opioids improved function and quality of life and in 2008,

the FDA noted "that [the claim that] patients who are treated with the drug experience an

improvement in their overall function, social function, and ability to perform daily activities .

. . has not been demonstrated by substantial evidence or substantial clinical experience."

92.     PURDUE and ENDO also falsely and misleadingly emphasized or exaggerated

the risks of competing products like NSAIDs, so that doctors and patients would look to

opioids first for the treatment of chronic pain. Once again, these misrepresentations by

PURDUE and ENDO contravene pronouncements by and guidance from the FDA and CDC

based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in

2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in

patients for which alternative treatment options" like non-opioid drugs "are inadequate." And

the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for

chronic pain, particularly arthritis and lower back pain.

93.     In addition, PURDUE misleadingly promoted OxyContin as being unique

among opioids in providing 12 continuous hours of pain relief with one dose.  In fact,

OxyContin does not last for 12 hours – a fact that PURDUE has known at all times relevant to

this action. According to PURDUE's own research, OxyContin wears off in under six hours in

one quarter of patients and in under 10 hours in more than half. This is because OxyContin

tablets release approximately 40% of their active medicine immediately, after which release

tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of

the dosing period, when less medicine is released. This phenomenon is known as "end of dose"

failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking

OxyContin experience it. This not only renders PURDUE 's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

94.     PURDUE 's competitors were aware of this problem. For example, ENDO ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, PURDUE falsely promoted OxyContin as if it were effective for a full 12 hours. Indeed, PURDUE's sales representatives continue to tell Indiana doctors that OxyContin lasts a full 12 hours.

95.     Front Groups supported by PURDUE likewise echoed these representations. For example, in an amicus brief submitted to the Supreme Court of Indiana by the American Pain Foundation, the National Foundation for the Treatment of Pain and the Indiana Pain Initiative in support of PURDUE, those amici represented:

> Oxycontin is particularly useful for sustained long-term pain because it comes in higher, compact pills with a slow release coating. OxyContin pills can work for 12 hours. This makes it easier for patients to comply with dosing requirements without experiencing a roller-coaster of pain relief followed quickly by pain renewal that can occur with shorter acting medications. It also helps the patient sleeps though the night, which is often impossible with short-acting medications. For many of those serviced by Pain Care Amici, Oxycontin has been a miracle medication.[22]

**3.     PURDUE and ENDO also engaged in other unlawful, unfair, and fraudulent misconduct.**

96.     PURDUE also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. PURDUE 's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law

enforcement authorities (as PURDUE is legally obligated to do) or cease marketing to them, PURDUE used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that PURDUE had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the *Los Angeles Times*, PURDUE 's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, PURDUE failed to take action – even where PURDUE employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, PURDUE did not report until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that PURDUE 's district manager described internally as "an organized drug ring." In doing so, PURDUE protected its own profits at the expense of public health and safety.

97.     The State of New York's settlement with PURDUE specifically cited the company for failing to adequately address suspicious prescribing. Yet, on information and belief, PURDUE continues to profit from the prescriptions of such prolific prescribers.

98.     Like PURDUE, ENDO has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with ENDO, the State of New York found that ENDO failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

**G.     PURDUE and ENDO Targeted Susceptible Prescribers And Vulnerable Patient Populations.**

99.   As a part of their deceptive marketing scheme, PURDUE and ENDO identified and targeted susceptible prescribers and vulnerable patient populations in the U.S., including Indiana. For example, PURDUE and ENDO focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept PURDUE and ENDO's misrepresentations.

100.   PURDUE and ENDO also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. PURDUE and ENDO targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guideline therefore concludes that there are "special risks of long-term opioid use for elderly patients" and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

**H.    Although PURDUE and ENDO Knew That Their Marketing Of Opioids Was False And Deceptive, They Fraudulently Concealed Their Misconduct.**

101.   PURDUE and ENDO, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, established that

opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned PURDUE and ENDO of this, and PURDUE and ENDO had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of PURDUE and ENDO's misrepresentations, and ENDO and PURDUE have recently entered agreements prohibiting them from making some of the same misrepresentations described in this Complaint in New York.

102.   Moreover, at all times relevant to this Complaint, PURDUE and ENDO took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct.  For example, PURDUE and ENDO disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. PURDUE and ENDO purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of PURDUE and ENDO' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain. PURDUE and ENDO also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. PURDUE and ENDO exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not

disclose ENDO's involvement. Other such as PURDUE and Janssen, ran similar websites that masked their own direct role.

103.    Finally, PURDUE and ENDO manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. PURDUE and ENDO distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for PURDUE and ENDO' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by the State.

104.    Thus, PURDUE and ENDO successfully concealed from the medical community, patients, and health care payers facts sufficient to arouse suspicion of the claims that the State now asserts. The State of Indiana, in general, and the CITY OF MADISON in particular did not know of the existence or scope of PURDUE and ENDO' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**I.    By Increasing Opioid Prescriptions And Use, PURDUE and ENDO's Deceptive Marketing Scheme Has Fueled The Opioid Epidemic And Devastated Indiana Communities.**

105.    PURDUE and ENDO's misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

106.   PURDUE and ENDO's deceptive marketing scheme caused and continues to cause doctors in Indiana to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent PURDUE and ENDO's deceptive marketing scheme, these doctors would not have prescribed as many opioids. PURDUE and ENDO's deceptive marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective.  Absent PURDUE and ENDO' deceptive marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

107.   PURDUE and ENDO's deceptive marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in PURDUE and ENDO's spending on their deceptive marketing scheme. PURDUE and ENDO's spending on opioid marketing totaled approximately $91 million in 2000.  By 2011, that spending had tripled to $288 million.

108.   The escalating number of opioid prescriptions written by doctors who were deceived by PURDUE and ENDO's deceptive marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and Indiana. In August 2016, then-U.S. Surgeon General Vivek Murthy published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."

109. Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." <u>Patients receiving prescription opioids for chronic pain account for the majority of overdoses</u>. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

110. Contrary to these misrepresentations, most opioid addiction begins with legitimately *prescribed* opioids, and therefore could have been prevented had PURDUE and ENDO' representations to prescribers been truthful. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from pill mills, drug dealers or the internet. Numerous doctors and substance abuse counselors note that many of their patients who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic.

111. PURDUE and ENDO's deceptive marketing scheme has also had a significant detrimental impact on children in Indiana in a number of ways. First, the overprescribing of opioids for chronic pain has made the drugs more accessible to school-aged children, who come into contact with opioids after they have been prescribed to friends or relatives in the same household. The overprescribing of opioids for chronic pain caused by PURDUE and ENDO's deceptive marketing scheme has also resulted in a dramatic rise in the number of infants in Indiana, in general, and the in the CITY OF MADISON particular who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome. These infants face painful withdrawal and may suffer long-term neurologic and cognitive impacts. Babies with NAS typically require more extensive

hospital stays as they withdraw than non NAS infants. The average inpatient stay and bill for NAS infants was longer and higher than for NAS infants. Opioid addiction is now the primary reason for which substance abuse treatment is sought. PURDUE and ENDO's creation, through false and deceptive advertising and other unlawful and unfair conduct, of a virtually limitless opioid market has significantly harmed communities throughout Indiana. PURDUE and ENDO's success in extending the market for opioids to new patients and chronic pain conditions has created an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and injury. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.

112.    Law enforcement agencies have increasingly associated prescription drug abuse with violent and property crimes. Despite strict federal regulation of prescription drugs, local law enforcement agencies are faced with increasing diversion from legitimate sources for illicit purposes, including: doctor shopping, forged prescriptions, falsified pharmacy records, and employees who steal from their place of employment. The opioid epidemic has prompted a growing trend of crimes against pharmacies including robbery and burglary. In fact, a 2005 study by The Center on Addiction and Substance Abuse at Columbia University revealed that, by that time, 20.9% of pharmacies nationwide had stopped stocking certain medications such as OxyContin and Percocet, in order to protect themselves from robbery. This ongoing diversion of prescription narcotics creates a lucrative marketplace.

113.    The number of criminal possession charges for opioid drugs has also increased across the City.

114.    PURDUE and ENDO knew and should have known about these harms that their deceptive marketing has caused. PURDUE and ENDO closely monitored their sales and

the habits of prescribing doctors. Their sales representatives, who visited doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding. PURDUE and ENDO also had access to and watched carefully government and other data that tracked the explosive rise in opioid use, addiction, injury, and death.  They knew – and, indeed, intended – that their misrepresentations would persuade doctors to prescribe and patients to use their opioids for chronic pain.

115.   PURDUE and ENDO' actions are not permitted nor excused by the fact that their drug labels may have allowed or did not exclude the use of opioids for chronic pain. FDA approval of opioids for certain uses did not give PURDUE and ENDO license to misrepresent the risks and benefits of opioids. Indeed, PURDUE and ENDO' misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

116.   Nor is PURDUE and ENDO's causal role broken by the involvement of doctors. PURDUE and ENDO's marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. PURDUE and ENDO also were able to harness and hijack what doctors wanted to believe – namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

## G. PURDUE and ENDO' Fraudulent Marketing Has Led To Record Profits.

117.   While the use of opioids has taken an enormous toll on the State of Indiana and its residents, PURDUE and ENDO have realized blockbuster profits. In 2014 alone, opioids generated $11 billion in revenue for drug companies like PURDUE and ENDO. Indeed, financial information indicates that each Defendant experienced a material increase

in sales, revenue, and profits from the false and deceptive advertising and other unlawful and unfair conduct described above.

## FIRST CAUSE OF ACTION
### PUBLIC NUISANCE
### INDIANA COMMON LAW

118.   The CITY OF MADISON realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

119.   This action is brought by the CITY OF MADISON pursuant to Indiana common law to seek damages and abate the public nuisance created by the PURDUE and ENDO.

120.   PURDUE and ENDO, individually and in concert with each other, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of citizens of the CITY OF MADISON   and interferes with the comfortable enjoyment of life in violation of Indiana law.

121.   The public nuisance created by PURDUE and ENDO' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.   The staggering rates of opioid use resulting from PURDUE and ENDO's marketing efforts have caused harm to the community that includes, but is not limited to:

a.      High rates of lawful use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

b.      Children too have been harmed by opioids. They have been exposed to medications prescribed to family members or others, resulting in injury, addiction, and death. Easy access to prescription opioids has made opioids a recreational drug of

choice among Indiana teenagers; opioid use among teenagers is only outpaced by marijuana use. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c.     Citizens of the CITY OF MADISON who have never taken opioids also have suffered the costs of PURDUE and ENDO' public nuisance. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d.     More broadly, opioid use and misuse have driven Citizens of the CITY OF MADISON' health care costs higher.

e.     Employers have lost the value of productive and healthy employees who suffered from adverse consequences from opioid use.

f.     PURDUE and ENDO' success in extending the market for opioids to new patients and chronic conditions has also created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury. PURDUE and ENDO's scheme created both ends of a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them.

g.     This demand also has created additional illicit markets in other opiates, articularly heroin. The low cost of heroin has led some of those who initially become addicted to prescription opioids to migrate to cheaper heroin, fueling a new heroin epidemic in the process.

h.     The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has increased the demands on emergency services and law enforcement in the CITY OF MADISON and the State.

i.     All of this has caused significant harm to the community – in lives lost; addictions endured; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken families and homes.

j.     These harms have taxed the human, medical, public health, law enforcement, and financial resources of the CITY OF MADISON

and the State.

k.      PURDUE and ENDO' interference with the comfortable enjoyment of life of a substantial number of people is entirely unreasonable because there is little social utility to opioid use and any potential value is outweighed by the gravity of the harm inflicted by PURDUE and ENDO' actions.

122.   PURDUE and ENDO knew or should have known that their promotion of opioid use would create a public nuisance.

a.      PURDUE and ENDO have engaged in massive production, promotion, and distribution of opioids for use by the citizens of the CITY OF MADISON and the State.

b.      PURDUE and ENDO' actions created and expanded the market for opioids, promoting its wide use for pain management.

c.      PURDUE and ENDO misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs.

d.      PURDUE and ENDO knew or should have known that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

123.   PURDUE and ENDO' actions were, at the least, a substantial factor in opioids becoming widely available and widely used. PURDUE and ENDO's actions were, at the least, a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain.  Without PURDUE and ENDO's actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

124.   The health and safety of the citizens of the State, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to the State's citizens and residents.

125.   The public nuisance created, perpetuated, and maintained by PURDUE and

ENDO can be abated and further reoccurrence of such harm and inconvenience can be prevented.

126.    PURDUE and ENDO's conduct has affected and continues to affect a considerable number of people within the CITY OF MADISON and the State is likely to continue to cause significant harm to chronic pain patients who take opioids, their families, and the community at large.

127.    Each Defendant created or assisted in the creation of the epidemic of opioid use and injury, and each Defendant is jointly and severally liable for abating it.

## SECOND CAUSE OF ACTION

### INDIANA DECEPTIVE CONSUMER
### SALES ACT  ("DECA") I.C. 24-5-0.5 *et seq.*

128.    The CITY OF MADISON realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

129.    This Cause of Action is brought in the public interest under the Indiana Deceptive Consumer Sales Act ("DECA"), I.C. 24-5-0.5, *et seq.*, and seeks a declaratory judgment that PURDUE and ENDO have violated the DECA, an injunction enjoining PURDUE  and ENDO' misrepresentations described in this Complaint, restitution to Indiana consumers who paid for opioid prescriptions for chronic pain and therefore have been damaged by Manufacturing Defendants' conduct, and civil penalties. Between 2006 and 2016, Indiana consumers spent million on Manufacturing Defendants' opioids.

130.    The DECA prohibits, in connection with consumer transactions, unfair, deceptive or unconscionable consumer sales practices that mislead consumers about the

nature of the product they are receiving. Specifically, the DECA prohibits sellers from representing that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have.

131.   In addition, DECA prohibits any deceptive act or practice which would cause a reasonable consumer to believe statements are true, where in fact they are false and misleading.

132.   Further, under DECA the following would be deemed to be deceptive pursuant:

- Making any express or implied statement in connection with the marketing or advertisement of any product that is false, or has the capacity, tendency or effect of deceiving or misleading consumers; or omitting any material information such that the express or implied statement deceives or tends to deceive consumers.

- Making any representation, in connection with the marketing or advertising of a product, about research that has been performed, including but not limited to any representation that a product has been clinically tested unless at the time the claim is made, competent and reliable scientific evidence exists substantiating such claim.

- Making, in connection with the marketing or advertising of a product . . . any statements or representations concerning a product that materially contradict or conflict with any other statements or representations the Manufacturing Defendants made about such Product and rend such statements or representations misleading and/or deceptive.

- Making, or causing to be made, any written or oral claim that is false, misleading or deceptive.

- Representing that any product has any sponsorship, approval, characteristics, ingredients, uses, benefits, quantities, or qualities that it does not have.

- Representing that any product has any sponsorship, characteristics, ingredients, uses, benefits, quantities, or qualities that it does not have.

- Making in a promotional context an express or implied representation, not approved or permitted for use in the labeling or

under the FDCA, that a product is better, more effective, useful in a broader range of conditions or patients, safer, has fewer, or less incidence of, or less serious side effects or contraindications than has been demonstrated by competent and reliable scientific evidence, whether or not such express or implied representation is made by comparison with another drug or treatment, and whether or not such a representation or suggestion is made directly or through use of published or unpublished literature, a quotation, or other reference.

- Presenting information from a study in a way that implies that the study represents larger or more general experience with a product than it actually does.

- Misleadingly presenting favorable information or conclusion(s) from a study that is inadequate in design, scope, or conduct to furnish significant support for such information or conclusion(s) for information that may be material to an HCP prescribing decision when presenting information about a clinical study regarding a product.

- Making, or causing to be made, any written or oral claim, directly or by promotional speakers, that is false, misleading, or deceptive regarding any FDA- approved product, including, but not limited to, any false, misleading, or deceptive claim when comparing the efficacy or safety of two products.

- Making any claim, directly or by promotional speakers, comparing the safety or efficacy of a product to another product when they claim is not supported by substantial evidence.
- Making any claim, directly or by promotional speakers, that contradicts or minimizes a precaution, warning, or adverse reaction that is described in product labeling.

133. As alleged herein, each Defendant, at all times relevant to this Complaint, violated the DCSP by making deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

134.   Defendant PURDUE made and/or disseminated deceptive statements,

including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials distributed to Indiana consumers that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through PURDUE 's own unbranded publications and on internet sites PURDUE operated that were marketed to and accessible by consumers;

- Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

- Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non- cancer pain;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Exclusively disseminating misleading statements in education materials to Indiana hospital doctors and staff while purportedly

educating them on new pain standards;

- Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Indiana prescribers through in-person detailing; and

- Withholding from Indiana law enforcement the names of prescribers PURDUE believed to be facilitating the diversion of its products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs they knew would reach these same prescribers.

135. Defendant ENDO made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high- risk patients;

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that ENDO's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through ENDO's own unbranded publications and on internet sites ENDO sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Indiana prescribers through in-person detailing.

## THIRD CAUSE OF ACTION

### COMMON LAW FRAUD

136.    The CITY OF MADISON   realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

137.    As alleged herein, Manufacturing Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

138.    Defendant PURDUE made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials distributed to Indiana consumers that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through PURDUE's own unbranded publications and on internet sites PURDUE operated that were marketed to and accessible by consumers;

- Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

- Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non- cancer pain;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Exclusively disseminating misleading statements in education materials to Indiana hospital doctors and staff while purportedly educating them on new pain standards;

- Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Indiana prescribers through in-person detailing; and

- Withholding from Indiana law enforcement the names of prescribers PURDUE believed to be facilitating the diversion of its products, while simultaneously marketing opioids to these doctors by disseminating patient and prescribereducation materials and advertisements and CMEs they knew would reach these same prescribers.

139.    Defendant ENDO made and/or disseminated deceptive statements, including,

but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high- risk patients;

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that ENDO's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through ENDO's own unbranded publications and on internet sites ENDO sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations -- including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding

the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Indiana prescribers through in-person detailing.

### H.  Damages Caused by Manufacturing Defendants' Conduct

140.    The Defendants' violations of law and their pattern of illegal marketing and diversionary activity have directly and proximately caused the CITY OF MADISON and its citizens, to be injured in their business, property, and person.

141.    The CITY OF MADISON  seeks to recover the economic damages it has and continues to sustain as a result the widespread opioid crisis and resulting HIV epidemic adversely affecting the CITY OF MADISON , all of which has and continues to cause budgetary stress, decreasing *ad valorous* tax revenues at the same time  increasing its costs and, thus its ability to provide adequate, essential and necessary governmental services, including but not limited to  police protection, enforcement, and detention, EMS services, medical treatment facilities, estimated to be in the range of thirty percent (30%) or more,

142.    But for the misstatements made by Manufacturing Defendants, the Front Groups and the KOLs,  the scheme employed by the Opioids Marketing Enterprise, and diversionary conduct of the Pharmacy Defendants and Dealer Defendants as described above, the CITY OF MADISON  citizens and residents would not have paid for opioid prescriptions for chronic pain, been exposed to addictive, life-destroying drugs, unable to maintain

employment and other general and economic damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays:

a.      That the acts alleged herein be adjudged and decreed to be unlawful in violation of State statutory and common law and that the Court enter a judgment declaring them to be so;

b.      That Manufacturing Defendants be enjoined from, directly or indirectly through KOLs, Front Groups or other third parties, continuing to misrepresent the risks and benefits of the use of opioids for chronic pain, and from continuing to violate Indiana law;

c.      That Plaintiff recover all measures of damages allowable under the State statutes identified herein and the common law, and that judgment be entered against Defendants in favor of Plaintiff;

d.      That Plaintiff recover restitution on behalf of the CITY OF MADISON consumers who paid for opioids for chronic pain;

e.      That Plaintiff receive an award of civil penalties for Manufacturing Defendants' deceptive acts;

f.      That Plaintiff recover the costs and expenses of suit, pre- and post judgment interest, and reasonable attorneys' fees as provided by law;

g.      That Manufacturing Defendants be ordered to abate the public nuisance that they created in violation of Indiana common law;

h.    That the Manufacturing Defendants be ordered such punitive and treble damages as are allowed by law; and

i.    That the Court award such further relief as is appropriate under the premises.

RESPECTFULLY SUBMITTED,

JENNER & PATTISON

By: */s/ William Joseph Jenner*
     William Joseph Jenner

William Joseph Jenner, #26853-49
Attorney for Plaintiff
Jenner & Pattison
508 East Main Street
Madison, IN 47250
Telephone: (812) 265-5132

Filed: 6/18/2019 1:38 PM
Jefferson Circuit Court
Jefferson County, Indiana

STATE OF INDIANA    )            IN THE JEFFERSON CIRCUIT COURT
                    ) SS:
COUNTY OF JEFFERSON  )           CAUSE NO. 39C01-1906-PL-00565

CITY OF MADISON, INDIANA,
A POLITICAL SUBDIVISION OF THE
STATE OF INDIANA, LOCATED IN
JEFFERSON COUNTY, INDIANA,
BY AND THRU ITS MAYOR AND
COMMON COUNCIL,

               Plaintiff,

       VS

PURDUE PHARMA L.P.; PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;
ENDO HEALTH SOLUTIONS, INC.; ENDO
PHARMACEUTICALS, INC.; SAMANTHA BEAVER;
KEVIN L. FOSTER; BRITTANY BERKSHIRE; JOE GAY, JR.;
JESSE BOBB; MICHAEL WHITE; ELSA MARIE NEACE;
GLENN MICHAEL FIELDS; CLAUDE HOLT, JR.;
JAMES COOMER; LLOYD E. McNEAR;
CHRISTOPHER C. SMITH; JOEL E.
BARRETT, JR.; and DOES 1 THROUGH 100, INCLUSIVE,
               Defendants.

SUMMONS

THE STATE OF INDIANA TO DEFENDANT:

(Name)   PURDUE PHARMA L.P., c/o Highest Executive Officer Found

(Address)   One Stamford Forum, 201 Tresser Blvd., Stamford, CT 06901-3431

      You are hereby notified that plaintiff has filed in the Jefferson Circuit Court a Complaint.

      The nature of the suit against you is stated in the Complaint which is attached to this document.  It also states the demand which the plaintiff has made and wants from you.

      You must answer the Complaint in writing, by you or your attorney, within twenty (20) days commencing the date after you receive this summons (or twenty-three (23) days if this summons was received by mail), or judgment will be entered against you for what the plaintiff has demanded.

      If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

DATED:  6/18/2019

                                   *Tabatha Eblen*
                           CLERK, JEFFERSON CIRCUIT COURT (Seal)

The following manner of service of Summons is hereby designated:  U. S. Postal Service certified mail, return receipt

William Joseph Jenner, #26853-49, Jenner & Pattison, Attorney for Plaintiff, 508 East Main Street, Madison, Indiana, 47250, Telephone: (812) 265-5132; Facsimile: (812) 265-5691; E-Mail: jjenner@wjennerlaw.net

Filed: 6/18/2019 1:38 PM
Jefferson Circuit Court
Jefferson County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE JEFFERSON CIRCUIT COURT |
| | ) SS: | |
| COUNTY OF JEFFERSON | ) | CAUSE NO. 39C01-1906-PL-00565 |

CITY OF MADISON, INDIANA,
A POLITICAL SUBDIVISION OF THE
STATE OF INDIANA, LOCATED IN
JEFFERSON COUNTY, INDIANA,
BY AND THRU ITS MAYOR AND
COMMON COUNCIL,

                    Plaintiff,

        VS

PURDUE PHARMA L.P.; PURDUE PHARMA, INC.;
THE PURDUE FREDERICKCOMPANY, INC.;
ENDO HEALTH SOLUTIONS, INC.; ENDO
PHARMACEUTICALS, INC.; SAMANTHA BEAVER;
KEVIN L. FOSTER; BRITTANY BERKSHIRE; JOE GAY, JR.;
JESSE BOBB; MICHAEL WHITE; ELSA MARIE NEACE;
GLENN MICHAEL FIELDS; CLAUDE HOLT, JR.;
JAMES COOMER; LLOYD E. McNEAR;
CHRISTOPHER C. SMITH; JOEL E.
BARRETT, JR.; and DOES 1 THROUGH 100, INCLUSIVE,
                  Defendants.

<u>SUMMONS</u>

THE STATE OF INDIANA TO DEFENDANT:

(Name)   THE PURDUE FREDERICK COMPANY, INC., c/o Highest Executive Officer Found         

(Address)   One Stamford Forum, 201 Tresser Blvd., Stamford, CT 06901-3431         

        You are hereby notified that plaintiff has filed in the Jefferson Circuit Court a Complaint.

        The nature of the suit against you is stated in the Complaint which is attached to this document.  It also states the demand which the plaintiff has made and wants from you.

        You must answer the Complaint in writing, by you or your attorney, within twenty (20) days commencing the date after you receive this summons (or twenty-three (23) days if this summons was received by mail), or judgment will be entered against you for what the plaintiff has demanded.

        If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

    DATED 6/18/2019            

                                        *Tabatha Eden*

                                      CLERK, JEFFERSON CIRCUIT COURT (Seal)

The following manner of service of Summons is hereby designated:  U. S. Postal Service certified mail, return receipt.

William Joseph Jenner, #26853-49, Jenner & Pattison, Attorney for Plaintiff, 508 East Main Street, Madison, Indiana, 47250.
Telephone: (812) 265-5132; Facsimile: (812) 265-5691; E-Mail: jjenner@wjennerlaw.net

Filed: 6/14/2019 10:49 AM
Clerk
Jefferson County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE JEFFERSON CIRCUIT COURT |
| | ) SS: | |
| COUNTY OF JEFFERSON | ) | CAUSE NO. __39C01-1906-PL-00565__ |

Jefferson Circuit Court

CITY OF MADISON, INDIANA,
A POLITICAL SUBDIVISION OF THE
STATE OF INDIANA, LOCATED IN
JEFFERSON COUNTY, INDIANA,
BY AND THRU ITS MAYOR AND
COMMON COUNCIL,
                              Plaintiff,


                    VS


PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK
COMPANY, INC.; ENDO HEALTH
SOLUTIONS, INC.; ENDO
PHARMACEUTICALS, INC.;
SAMANTHA BEAVER; KEVIN L. FOSTER;
BRITTANY BERKSHIRE; JOE GAY, JR.;
JESSE BOBB; MICHAEL WHITE;
ELSA MARIE NEACE; GLENN MICHAEL
FIELDS; CLAUDE HOLT, JR.;
JAMES COOMER; LLOYD E. McNEAR;
CHRISTOPHER C. SMITH; JOEL E.
BARRETT, JR.; and
DOES 1 THROUGH 100, INCLUSIVE,
                              Defendants.

## APPEARANCE BY ATTORNEY IN CIVIL CASE

Party Classification:
        Initiating __X__ Responding _____ Intervening _____

1.      The undersigned attorney and all attorneys listed on this form now appear in this case for the following party member (s): **CITY OF MADISON, INDIANA, A POLITICAL SUBDIVISION OF THE STATE OF INDIANA, LOCATED IN JEFFERSON COUNTY, INDIANA, BY AND THRU ITS MAYOR AND COMMON COUNCIL**

2.      Applicable attorney information for service as required by Trial Rule 5(B)(2) and for case information required by Trial Rules 3.1 and 77(B) is as follows:

Name:        William Joseph Jenner          Attorney Number:  26853-49

Address:     Jenner & Pattison
             508 East Main Street           Telephone:  (812) 265-5132
             Madison, Indiana, 47250        Facsimile:  (812) 265-5691

3.    If first initiating party filing this case, the Clerk is requested to assign this case the following Case Type under Administrative Rule 8(b)(3): _____PL_____.

4.    I will accept service by FAX at the above noted number:

      Yes _____          No _X___

5.    This case involves support issues:

      Yes _____          No _X___

6.    There are related cases:

      Yes _____          No _X___

7.    Additional information required by local rules: _____.

JENNER & PATTISON

By */s/ William Joseph Jenner*_____
     William Joseph Jenner

William Joseph Jenner, #26853-49
Jenner & Pattison
508 East Main Street
Madison, Indiana, 47250
Telephone: (812) 265-5132
E-Mail:  jjenner@wjennerlaw.net

2

STATE OF INDIANA      )            IN THE JEFFERSON CIRCUIT COURT
                         ) SS:
COUNTY OF JEFFERSON  )            CAUSE NO.  39C01-1906-PL-00565

---

CITY OF MADISON, INDIANA,
A POLITICAL SUBDIVISION OF THE
STATE OF INDIANA, LOCATED IN
JEFFERSON COUNTY, INDIANA,
BY AND THRU ITS MAYOR AND
COMMON COUNCIL,

                  Plaintiff,

vs.

PURDUE PHARMA L.P .;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK
COMPANY, INC.; ENDO HEALTH
SOLUTIONS INC.; ENDO
PHARMACEUTICALS, INC.;
SAMANTHA BEAVER; KEVIN L. FOSTER;
BRITTANY BERKSHIRE; JOE GAY, JR.;
JESSE BOBB; MICHAEL WHITE;  ELSA
MARIE NEACE; GLENN MICHAEL FIELDS;
CLAUDE HOLT, JR.; JAMES COOMER;
LLOYD E. McNEAR; CHRISTOPHER C.
SMITH; JOEL E. BARRETT, JR.; AND
DOES 1 THROUGH 100, INCLUSIVE,

                Defendants.

## E-FILING APPEARANCE BY ATTORNEY IN CIVIL CASE

**This Appearance Form must be filed on behalf of every party in a civil case.**
1. The party on whose behalf this form is being filed is:
    Initiating ____         Responding _x___   Intervening ____ ; and
    the undersigned attorney and all attorneys listed on this form now appear in this case for
    the following parties:
    Name of parties:_____**Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.**
    _____
    Address of party *(see Question # 5 below if this case involves a protection from abuse*
    *order, a workplace violence restraining order, or a no-contact order)*
    _____***Contact through counsel***_____
    Telephone # of party _____
*(List on a continuation page additional parties this attorney represents in this case.)*

2. Attorney information for service as required by Trial Rule 5(B)(2)

        Kathleen A. DeLaney
        Attorney No. 18604-49
        DeLaney & DeLaney LLC
        3646 N. Washington Blvd.
        Indianapolis, IN 46205
        Phone: (317) 920-0400
        Fax: (317) 920-0404
        kathleen@delaneylaw.net

**IMPORTANT**: Each attorney specified on this appearance:

(a)     certifies that the contact information listed for him/her on the Indiana Supreme Court Roll of Attorneys is current and accurate as of the date of this Appearance;

(b)     **acknowledges that all orders, opinions, and notices from the court in this matter that are served under Trial Rule 86(G) will be sent to the attorney at the email address(es) specified by the attorney on the Roll of Attorneys regardless of the contact information listed above for the attorney**; and

(c)     understands that he/she is solely responsible for keeping his/her Roll of Attorneys contact information current and accurate, see Ind. Admis. Disc. R. 2(A).

Attorneys can review and update their Roll of Attorneys contact information on the Courts Portal at http://portal.courts.in.gov.

3. This is a ___ case type as defined in administrative Rule 8(B)(3).

4. This case involves child support issues. Yes ____ No __**x**__ *(If yes, supply social security numbers for all family members on a separately attached document filed as confidential information on **light green paper**. Use Form TCM-TR3.1-4.)*

5. This case involves a protection from abuse order, a workplace violence restraining order, or a no – contact order. Yes ____ No __**x**__ *(If Yes, the initiating party must provide an address for the purpose of legal service but that address should not be one that exposes the whereabouts of a petitioner.)* The party shall use the following address for purposes of legal service:

    _____    Attorney's address
    _____    The Attorney General Confidentiality program address
                (contact the Attorney General at 1-800-321-1907 or e-mail address is **confidential@atg.in.gov**).
    _____    Another address (provide)

 

This case involves a petition for involuntary commitment. Yes ____ No __**x**__

6. If Yes above, provide the following regarding the individual subject to the petition for involuntary commitment:

    a. Name of the individual subject to the petition for involuntary commitment if it is not already provided in #1 above:

 

    b. State of Residence of person subject to petition: _____

    c. At least one of the following pieces of identifying information:

(i)   Date of Birth _____
(ii)  Driver's License Number _____
      State where issued _____ Expiration date _____
(iii) State ID number _____
      State where issued _____ Expiration date _____
(iv)  FBI number _____
(v)   Indiana Department of Corrections Number _____
(vi)  Social Security Number is available and is being provided in an attached
      confidential document Yes ____ No __**x**__

7. There are related cases: Yes ___ No __**x**__ *(If yes, list on continuation page.)*
8. Additional information required by local rule:
   _____
   _____
9. There are other party members: Yes ____ No __**x**__ *(If yes, list on continuation page.)*
10. This form has been served on all other parties and Certificate of Service is attached:
    Yes__**x**__ No____

                         Respectfully submitted,

                         */s/ Kathleen A. DeLaney*
                         Kathleen A. DeLaney (#18604-49)
                         DELANEY & DELANEY LLC
                         3646 Washington Blvd.
                         Indianapolis, IN 46205
                         Tel: (317) 920-0400

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Joshua S. Stigdon                          Greg Morin
HOUSTON, THOMPSON AND LEWIS, P.C.          MONTGOMERY, ELSNER & PARDIECK
49 E. Wardell Street,                      P.O. Box 647
Scottsburg, IN 47170                       Seymour, IN 472724
jstigdon@htllawyers.com                    gmorin@meplegal.com

*Counsel for Plaintiff*                    *Counsel for Defendant Jesse Bobb*

Eric A. Riegner
Jenai M. Brackett
FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
eriegner@fbtlaw.com
jbrackett@fbtlaw.com

*Counsel for Defendants Purdue Pharma L.P.,*

*Purdue Pharma Inc.; and The Purdue Frederick
Company Inc.*

I further certify that on the 17th day of July, 2019, a copy of the foregoing was deposited in the United States mail, postage prepaid, addressed to the following parties:

Samantha Beaver
8865 Chessie Drive
Indianapolis, IN 46217

Kevin L. Foster
1015 Gallium Drive
Cicero, IN 46034

Brittany Berkshire
115 18th Street
Logansport, IN 46947

Glenn M. Fields, DOC#189110
Branchville Correctional Facility
c/o K. Alvery, Warden
21390 Old SR 37
Branchville, IN 47514

Lloyd McNear
1301 W. York Road, Lot 106
Austin, IN 47102

Claude Holt Jr., DOC #955286
Plainfield Correctional Facility
Stan Knight, Warden
727 Moon Road
Plainfield, IN 46168

Michael White, DOC#171963
Edinburgh Correctional Facility
Fran Osburn, Warden
PO Box 470
Edinburgh, IN 46124

A copy of this Motion has not been served to the following individual named defendants to whom summonses have not been issued as of the date of this filing.

Christopher C. Smith
Joe Gay, Jr.
James Coomer
Elsa M. Neace

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney

DeLaney & DeLaney LLC
3646 Washington Blvd.
Indianapolis, IN 46205

4

STATE OF INDIANA      )           IN THE JEFFERSON CIRCUIT COURT
                         ) SS:
COUNTY OF JEFFERSON  )           CAUSE NO.  39C01-1906-PL-00565

---

CITY OF MADISON, INDIANA,
A POLITICAL SUBDIVISION OF THE
STATE OF INDIANA, LOCATED IN
JEFFERSON COUNTY, INDIANA,
BY AND THRU ITS MAYOR AND
COMMON COUNCIL,

                 Plaintiff,

vs.

PURDUE PHARMA L.P .;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK
COMPANY, INC.; ENDO HEALTH
SOLUTIONS INC.; ENDO
PHARMACEUTICALS, INC.;
SAMANTHA BEAVER; KEVIN L. FOSTER;
BRITTANY BERKSHIRE; JOE GAY, JR.;
JESSE BOBB; MICHAEL WHITE;  ELSA
MARIE NEACE; GLENN MICHAEL FIELDS;
CLAUDE HOLT, JR.; JAMES COOMER;
LLOYD E. McNEAR; CHRISTOPHER C.
SMITH; JOEL E. BARRETT, JR.; AND
DOES 1 THROUGH 100, INCLUSIVE,

                 Defendants.

## MANUFACTURER DEFENDANTS' UNOPPOSED
## MOTION FOR ENLARGEMENT OF TIME TO RESPOND TO COMPLAINT

      Manufacturer Defendants,[1] by counsel, move the Court for an enlargement of time of an

additional 60 days, to and including September 27, 2019, within which to answer, move, or

otherwise respond to Plaintiff's Amended Complaint, and in support thereof, state the following:

      1.     Plaintiff filed its Amended Complaint in this matter on June 18, 2019.

---

[1] The served Manufacturer Defendants refers to: Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick
Company Inc.; Endo Health Solutions Inc.; and Endo Pharmaceuticals Inc.  Manufacturer Defendants dispute that
they have been served properly, but join this motion out of an abundance of caution and expressly reserve all
defenses, including those related to personal jurisdiction and service of process.

2.      The response of Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company Inc. ("Purdue") to Plaintiff's Amended Complaint is currently due on July 26, 2019.

3.      The response of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo") to Plaintiff's Complaint is currently due on July 17, 2019.

4.      Counsel for Plaintiff has been contacted and has no objection to this extension.

5.      Kathleen A. DeLaney is entering her appearance on behalf of Endo, simultaneously herewith.

6.      Eric A. Riegner and Jenai M. Brackett are entering their appearance on behalf of Purdue.

7.      The undersigned counsel represent that this Motion for Enlargement of Time is made in good faith and is not intended to hinder or delay the prosecution of this matter.

WHEREFORE, Manufacturer Defendants, by counsel, respectfully request an additional 60 days, to and including September 27, 2019, to answer, move, or otherwise respond to Plaintiffs' Amended Complaint.

Respectfully submitted,

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney, #18604-49
DELANEY & DELANEY
3646 Washington Blvd.
Indianapolis, IN  46205
Telephone: 317-920-0400
Fax: 317-920-0404
kathleen@delaneylaw.net

*Counsel for Defendants Endo Health Solutions Inc.*
*and Endo Pharmaceuticals Inc.*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Joshua S. Stigdon
HOUSTON, THOMPSON AND LEWIS, P.C.
49 E. Wardell Street,
Scottsburg, IN 47170
jstigdon@htllawyers.com

*Counsel for Plaintiff*

Greg Morin
MONTGOMERY, ELSNER & PARDIECK
P.O. Box 647
Seymour, IN 472724
gmorin@meplegal.com

*Counsel for Defendant Jesse Bobb*

Eric A. Riegner
Jenai M. Brackett
FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN 46244-0961
eriegner@fbtlaw.com
jbrackett@fbtlaw.com

*Counsel for Defendants Purdue Pharma L.P.,
Purdue Pharma Inc.; and The Purdue Frederick
Company Inc.*

I further certify that on the 17th day of July, 2019, a copy of the foregoing was deposited in the United States mail, postage prepaid, addressed to the following parties:

Samantha Beaver
8865 Chessie Drive
Indianapolis, IN 46217

Brittany Berkshire
115 18th Street
Logansport, IN 46947

Lloyd McNear
1301 W. York Road, Lot 106
Austin, IN 47102

Kevin L. Foster
1015 Gallium Drive
Cicero, IN 46034

Glenn M. Fields, DOC#189110
Branchville Correctional Facility
c/o K. Alvery, Warden
21390 Old SR 37
Branchville, IN 47514

Claude Holt Jr., DOC #955286
Plainfield Correctional Facility
Stan Knight, Warden
727 Moon Road
Plainfield, IN 46168

Michael White, DOC#171963
Edinburgh Correctional Facility
Fran Osburn, Warden
PO Box 470
Edinburgh, IN 46124


     A copy of this Motion has not been served to the following individual named defendants to whom summonses have not been issued as of the date of this filing.

Christopher C. Smith
Joe Gay, Jr.
James Coomer
Elsa M. Neace


                                          */s/ Kathleen A. DeLaney*
                                          Kathleen A. DeLaney

DELANEY & DELANEY
3646 Washington Blvd.
Indianapolis, IN  46205

Information current as of 7/17/19, 1:02 PM EDT [10]

| doxpop™ www.doxpop.com | Indiana Chronological Case Summary |

## Chronological Case Summary
## Civil Docket, JEFFERSON CIRCUIT COURT

### For Cause: 39C01-1906-PL-00565
### CITY OF MADISON, INDIANA V. PURDUE PHARMA L.P.

**Action:** Civil Plenary

**File Date:** 06/14/2019

**Appearance**

**Complaint**

**Amended Complaint**

**Summons C. Holt**

**Summons G. Fields**

**Summons M. White**

**Summons J. Bobb**

**Summons B. Berkshire**

**Summons K. Foster**

**Summons S. Beaver**

**Summons Endo Pharmaceuticals**

**Summons Endo Health**

**Summons Purdue Frederick**

**Summons-Purdue Pharma**

**Summons L. McNear**

**Return of Service**

**Return of Service**

**Return of Service**

**Motion to Refund Filing Fee**

**Return of Service**

**Order Refunding Filing Fee**

**Return of Service**

**Return of Service- M. White**

**Return of Service-Purdue Frederick**

**Return of Service - Purdue Pharma**

**NUNC PRO TUNC ORDER REFUNDING FILING FEE**

**Appearance - Civil**

**Order on Extension of Time**

**Motion for Extension of Time**

**Appearance - Civil**
**Order on Extension of Time**
**Motion for Extension of Time**
**Appearance - Civil**
**Order on Extension of Time**
**Motion for Extension of Time**
**Motion for Extension of Time**
**Order on Extension of Time**

**Judgment**                                    Book:
                                                0;

| Attorneys: | Parties: |
| --- | --- |
| JENNER, WILLIAM JOSEPH [Attorney]<br><br>State Bar ID: 26853-49 | CITY OF MADISON, INDIANA [PLAINTIFF]<br>Address:<br>101 WEST MAIN STREET<br>MADISON , IN 47250 |
| | BARRETT JR, JOEL E [DEFENDANT] |
| | BEAVER, SAMANTHA [DEFENDANT] |
| | BERKSHIRE, BRITTANY [DEFENDANT] |
| MORIN, GREGORY S. [Attorney]<br>Address:<br>PO BOX 647<br>308 WEST 2ND STREET<br>SEYMOUR , IN 47274<br><br>Phones:<br>Business (Fax): 812-522-6473<br>Business (Phone): 812-522-4109<br><br>State Bar ID: 30045-49 | BOBB, JESSE [DEFENDANT] |
| | COOMER, JAMES [DEFENDANT] |
| | ENDO HEALTH SOLUTIONS, INC. [DEFENDANT] |
| | ENDO PHARMACEUTICALS, INC. [DEFENDANT] |
| | FIELDS, GLENN MICHAEL [DEFENDANT] |
| | FOSTER, KEVIN L [DEFENDANT] |
| | GAY JR, JOE [DEFENDANT] |

|  | HOLT JR, CLAUDE [DEFENDANT] |
|---|---|
|  | MCNEAR, LLOYD E [DEFENDANT] |
|  | NEACE, ELSA MARIE [DEFENDANT] |
|  | PURDUE PHARMA, INC. [DEFENDANT] |
|  | PURDUE PHARMA L.P. [DEFENDANT] |
|  | SMITH, CHRISTOPHER C [DEFENDANT] |
|  | THE PURDUE FREDERICK COMPANY, INC. [DEFENDANT] |
|  | WHITE, MICHAEL [DEFENDANT] |
|  | MOTE, DONALD J [Judge]<br>Address:<br>300 E MAIN ST<br>JEFFERSON CIRCUIT COURT<br>MADISON , IN 47250 |

## Chronological summary of filings and proceedings:

**Minute Date:** 6/14/2019   **Input Date:** Unavailable **Notice:** YES   **RJO:** NO

Appearance filed by William Jenner on behalf of City of Madison.

**Minute Date:** 6/14/2019   **Input Date:** Unavailable   **Notice:** NO   **RJO:** NO
**EFILING FEES ASSESSED**

Total eFiled amount of $157.00 assessed.

**Minute Date:** 6/14/2019   **Input Date:** Unavailable   **Notice:** NO   **RJO:** NO

Complaint Filed

**Minute Date:** 6/18/2019   **Input Date:** Unavailable   **Notice:** NO   **RJO:** NO

Case 4:19-cv-00156-JMS-DML Document 1-2 Filed 07/18/19 Page 89 of 94 PageID #: 177
Page 4 of 9

AMENDED COMPLAINT
Filed by William J Jenner
cs

---

**Minute Date:** 6/18/2019    **Input Date:** Unavailable    **Notice:** NO    **RJO:** NO

Summons to be served by Certified Mail on
Purdue Pharma.

cs

---

**Minute Date:** 6/18/2019    **Input Date:** Unavailable    **Notice:** NO    **RJO:** NO

Summons to be served by Certified Mail on
The Purdue Frederick Company.

cs

---

**Minute Date:** 6/18/2019    **Input Date:** Unavailable    **Notice:** NO    **RJO:** NO

Summons to be served by Certified Mail on
Endo Health Solutions, Inc.

cs

---

**Minute Date:** 6/18/2019    **Input Date:** Unavailable    **Notice:** NO    **RJO:** NO

Summons to be served by Certified Mail on
Endo Pharmaceuticals, Inc.

cs

---

**Minute Date:** 6/18/2019    **Input Date:** Unavailable    **Notice:** NO    **RJO:** NO

Case 4:19-cv-00156-JMS-DML Document 1-2 Filed 07/18/19 Page 90 of 94 PageID #: 178
Page 5 of 9

Summons to be served by Certified Mail on
Samantha Beaver.

cs

---

**Minute Date:** 6/18/2019
**Input Date:** Unavailable
**Notice:** NO
**RJO:** NO

Summons to be served by Certified Mail on
Kevin Foster.

cs

---

**Minute Date:** 6/18/2019
**Input Date:** Unavailable
**Notice:** NO
**RJO:** NO

Summons to be served by Certified Mail on
Brittany Berkshire.

cs

---

**Minute Date:** 6/18/2019
**Input Date:** Unavailable
**Notice:** NO
**RJO:** NO

Summons to be served by Certified Mail on
Jesse Bobb.

cs

---

**Minute Date:** 6/18/2019
**Input Date:** Unavailable
**Notice:** NO
**RJO:** NO

Summons to be served by Certified Mail on
Michael White.

cs

---

**Notice:** NO
**RJO:** NO

**Minute Date:**    **Input Date:**
6/18/2019      Unavailable

Summons to be served by Certified Mail on
Glenn Michael Fields.

cs

---

**Minute Date:**    **Input Date:**    **Notice:** NO      **RJO:** NO
6/18/2019      Unavailable

Summons to be served by Certified Mail on
Claude Holt, Jr.

cs

---

**Minute Date:**    **Input Date:**    **Notice:** NO      **RJO:** NO
6/18/2019      Unavailable

Summons to be served by Certified Mail on
Lloyd McNear.

cs

---

**Minute Date:**    **Input Date:**    **Notice:** NO      **RJO:** NO
6/25/2019      Unavailable

CERTIFIED MAIL SIGNED 6/21/19.
ADDRESSED TO Kevin L. Foster.
RECEIVED IN CLERK'S OFFICE ON 6/25/19.

---

**Minute Date:**    **Input Date:**    **Notice:** NO      **RJO:** NO
6/25/2019      Unavailable

CERTIFIED MAIL SIGNED 6/21/19.
ADDRESSED TO Glen Michael Fields.
RECEIVED IN CLERK'S OFFICE ON 6/25/19.

---

**Notice:** NO      **RJO:** NO

**Minute Date:**    **Input Date:**
7/2/2019             Unavailable

MOTION FOR REFUND OF FILING FEE
filed by William Joseph Jenner

slm

---

**Minute Date:**    **Input Date:**        **Notice:**    **RJO:** NO
7/2/2019             Unavailable             NO

Proposed Order Accepted  – sent to Judge for review.
re: Refunding Filing Fee

---

**Minute Date:**    **Input Date:**        **Notice:** NO    **RJO:** NO
7/2/2019             Unavailable

CERTIFIED MAIL SIGNED ?.
ADDRESSED TO Claude Holt, Jr..
RECEIVED IN CLERK'S OFFICE ON 7/2/19.

---

**Minute Date:** 7/3/2019  **Input Date:** Unavailable    **Notice:** YES    **RJO:** YES

ORDER REFUNDING FILING FEE
Clerk of Jefferson County directed to refund to Plaintiff, through its
counsel, the filing fee paid herein in the amount of 162.10.
lgb

---

**Minute Date:**    **Input Date:**        **Notice:** NO    **RJO:** NO
7/3/2019             Unavailable

CERTIFIED MAIL SIGNED 06/24/2019.
ADDRESSED TO ENDO HEALTH SOLUTIONS.
RECEIVED IN CLERK'S OFFICE ON 07/03/2019.

---

**Minute Date:**    **Input Date:**        **Notice:** NO    **RJO:** NO
7/9/2019             Unavailable

CERTIFIED MAIL SIGNED 7/2/19.
ADDRESSED TO Michael White.
RECEIVED IN CLERK'S OFFICE ON 7/9/19.

---

**Minute Date:** 7/9/2019     **Input Date:** Unavailable     **Notice:** NO     **RJO:** NO

CERTIFIED MAIL SIGNED ?.
ADDRESSED TO The Purdue Frederick Co., Inc.
RECEIVED IN CLERK'S OFFICE ON 7/9/19.

---

**Minute Date:** 7/9/2019     **Input Date:** Unavailable     **Notice:** NO     **RJO:** NO

CERTIFIED MAIL SIGNED ?.
ADDRESSED TO Purdue Pharma.
RECEIVED IN CLERK'S OFFICE ON 7/9/2019.

---

**Minute Date:** 7/9/2019   **Input Date:** Unavailable     **Notice:** YES     **RJO:** YES

NUNC PRO TUNC ORDER REFUNDING FILING FEE
Clerk to refund filing fee of $157.00.  Remainder of fee paid was for
processing and Clerk is unable to refund.

lgb

---

**Minute Date:** 7/12/2019     **Input Date:** Unavailable     **Notice:** YES     **RJO:** NO

Appearance filed by Greg S. Morin on behalf of Jesse Bobb.

---

**Minute Date:** 7/12/2019     **Input Date:** Unavailable     **Notice:** NO     **RJO:** NO

Proposed Order Accepted   - sent to Judge for review.
re: Extension of Time

---

**Minute Date:**  **Input Date:**   **Notice:** NO   **RJO:** NO
7/12/2019   Unavailable

MOTION FOR EXTENSION OF TIME
filed by Greg Morin

slm

---

**Minute Date:**        **Input Date:**        **Notice:**     **RJO:** YES
7/15/2019               Unavailable             YES

ORDER ON EXTENSION OF TIME (response by 9/30/19 by Defendant)
lme

---